## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| JAY D. GOULD, | |
| Plaintiff, | |
| vs. | Civil Action File No. |
| INTERFACE, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT

COMES NOW Plaintiff Jay D. Gould ("Mr. Gould"), and files the instant Complaint against Defendant Interface, Inc. ("Defendant") showing the Court as follows:

## PRELIMINARY STATEMENT

1.     Mr. Gould has more than twenty years of executive experience leading global brands and a legacy of transforming traditional businesses into purpose-driven organizations.

2.     Mr. Gould initially started with Defendant as Executive Vice President ("EVP") and Chief Operating Officer ("COO") in January 2015 before being appointed the Chief Executive Officer ("CEO") in March 2017.  Mr. Gould was notably just the third CEO in Defendant's forty-five-year history and succeeded

former CEO Daniel T. Hendrix ("Board Chair Hendrix"), who previously served as CEO for sixteen years, and served and continues serving as Chair of Defendant's Board of Directors ("Board").

3.      Mr. Gould fulfilled his duties as Defendant's CEO and indeed Defendant's net sales and gross profit on sales grew throughout Mr. Gould's tenure as CEO. During his five-year tenure at the Company, earnings per share more than doubled, from $0.62 to $1.54.

4.      Notwithstanding this phenomenal success, on November 5, 2019, Board Member Chris Kennedy ("Director Kennedy") threatened to destroy Mr. Gould's name and ensure that Mr. Gould would never work for a publicly traded company again if he did not submit to Director Kennedy's overbearing operational demands, including but not limited to, firing the Human Resource Officer and using a Chicago recruiting firm that Director Kennedy selected to conduct the search for the replacement.

5.      Less than three years after his appointment as CEO, Mr. Gould was wrongly terminated on January 19, 2020 in breach of his Amended and Restated Employment and Change in Control Agreement (the "Agreement") with Defendant. A true and correct copy of the Agreement is publicly available through the Securities and Exchange Commission as Defendant's Form 8-K filing dated April 11, 2017 and

is attached hereto as **Exhibit A**.

6.      The very next day, on January 20, 2020, Defendant unleashed a series of defamatory, disparaging and libelous statements with respect to Mr. Gould and his termination. As of the date of this filing, Defendant continues engaging in this defamatory, disparaging and libelous campaign against Mr. Gould; aimed at destroying his reputation despite Mr. Gould's demand that Defendant retract the defamatory statements.

7.      In light of the foregoing, Mr. Gould brings this action based on his claims against Interface for: (1) retaliation (2) breach of the Agreement; (3) defamation per se; (4) defamation; (5) negligence; and (6) attorneys' fees.  This action also seeks compensatory, punitive, and exemplary damages, and other appropriate relief for the willful and malicious injuries caused by Defendant's misconduct, which was intentionally targeted at Mr. Gould and his reputation with the intent to cause him financial harm.

8.      As of this date, Defendant has deprived Mr. Gould of in excess of ten million dollars ($10,000,000.00) in compensation and has directly disparaged his reputation causing further economic damages and mental anguish.

## PARTIES, JURISDICTION, AND VENUE

9.      Mr. Gould is the former CEO of Defendant, whose principal executive

office was located in Defendant's global headquarters in Atlanta, Georgia.

10.    Mr. Gould is a resident of Atlanta, Georgia.

11.    Defendant is a publicly traded corporation, organized and existing under the laws of the State of Georgia, with its principal place of business located at 1280 West Peachtree Street, NW, Atlanta, Georgia 30309, Fulton County.

12.    This Court has proper jurisdiction of the subject matter of this action under 28 U.S.C. § 1331 in that this action arises under the laws of the United States, and specifically 42 U.S.C. § 2000e-3. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13.    Mr. Gould timely filed his EEOC administrative charge and received his notice of right to sue, attached hereto as **Exhibit B**.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

15.    All conditions precedent to this action have been satisfied, excused or waived.

<u>**FACTUAL BACKGROUND**</u>

**I.    DEFENDANT INTERFACE, INC.**

16.    Defendant (TILE:NASDAQ) is a publicly traded corporation

headquartered in Atlanta, Georgia (Fulton County) with a current market value of over nine hundred and fifty-four million dollars ($954,000,000.00).

17.     Defendant is a global commercial flooring company with an integrated collection of carpet tiles and resilient flooring.  Defendant manufactures, markets, installs, and services products for commercial and institutional interiors markets. Defendant provides modular carpet, vinyl flooring, rubber flooring, and complementary products, as well as carpet replacement, installation, and maintenance services.

## II.     DEFENDANT APPOINTS MR. GOULD AS COO AND LATER AS CEO BASED UPON HIS PROVEN BUSINESS TRACK RECORD

### A.     Defendant Hires Mr. Gould As EVP and COO in January 2015 Based on Mr. Gould's "Focus on Power of Purpose"

18.     With more than twenty years of executive experience leading global brands and a legacy of transforming traditional businesses into purpose-driven organizations, Defendant hired Mr. Gould as Defendant's EVP and COO in January 2015 to oversee Defendant's global operations, marketing, and organization development.  Board Chair Hendrix noted that Mr. Gould was hired based on his "proven track record of creating value for some of the most successful international corporations in the world…; however, it is [Mr. Gould's] focus on the power of purpose that makes him the right fit for Interface.  [Mr. Gould] will help us design a

future for our Company that builds on our legacy and that maximizes our potential to be a high-performing organization while also fulfilling our mission of being environmentally and socially progressive." *See Interface Names Jay D. Gould Chief Operating Officer*, Interface.com (Jan. 13, 2015), https://investors.interface.com/news/press-release-details/2015/Interface-Names-Jay-D-Gould-Chief-Operating-Officer/default.aspx.

### B. Defendant Appoints Mr. Gould as President and COO Because "He Is a Great Partner As Well As a Good Cultural Fit at Interface"

19.     One year later, in January 2016, Mr. Gould was appointed as Defendant's President.   Defendant's former CEO, and Board Chair Hendrix commended Mr. Gould as a "great partner as well as a good cultural fit at Interface" and noted that Mr. Gould "has earned the confidence of our board of directors with his strategic vision, operational talents and business acumen".   *See Interface Appoints Jay D. Gould President and Chief Operating Officer*, Interface.com (Jan. 13, 2016), https://investors.interface.com/news/press-release-details/2016/Interface-Appoints-Jay-D-Gould-President-and-Chief-Operating-Officer/default.aspx.

### C. Defendant Appoints Mr. Gould as CEO Two Years Following His Hire Given His "Style of Leadership, Combined With His Global Brand Experience and Passion for Interface"

20.     The following year, Mr. Gould was appointed as Defendant's CEO

effective March 3, 2017 to succeed Board Chair Hendrix, who remained Board Chair.  Board Chair Hendrix again commended Mr. Gould's capabilities noting "I have every confidence in Jay's ability to build upon the company's success and lead Interface into a new stage.  Jay's energy is contagious and motivational.  His style of leadership, combined with his global brand experience and passion for Interface, makes him the perfect successor." *See Interface Appoints Jay D. Gould as Chief Executive Officer*, Interface.com (Feb. 22, 2017), https://investors.interface.com/news/press-release-details/2017/Interface-Appoints-Jay-D-Gould-as-Chief-Executive-Officer/default.aspx.

### D.     Mr. Gould's Amended and Restated Employment and Change in Control Agreement

21.     As a condition of his appointment to CEO, Mr. Gould executed the Agreement, effective March 3, 2017, with Defendant.  The Agreement sets forth the terms and conditions of Mr. Gould's employment as CEO.

22.     Among other things, the Agreement sets forth the means by which Mr. Gould's employment with Interface may be terminated.

23.     The Agreement provides that Defendant may terminate Mr. Gould's employment "in its sole discretion, whether with or without Cause, at any time upon written notice to [Mr. Gould]".  *See* **Ex. A**, **§ 5(c)**.

24.     The Agreement further defines "Cause" as follows:

"Cause" shall mean, for purposes of this Agreement (except with respect to a Section 409A Separation from Service following a Change in Control, which is addressed in Section 7(a)(i) hereof): (A) [Mr. Gould]'s fraud, dishonesty, gross negligence, or willful misconduct with respect to business affairs of the Company (including its subsidiaries and affiliated companies), (B) [Mr. Gould]'s refusal or repeated failure to follow the established lawful policies of the Company applicable to persons occupying the same or similar positions, (C) [Mr. Gould]'s material breach of this Agreement, or (D) [Mr. Gould]'s conviction of a felony or other crime involving moral turpitude. A termination of [Mr. Gould] for Cause based on clause (A), (B) or (C) of the preceding sentence shall take effect 30 days after [Mr. Gould] receives from the Company written notice of intent to terminate and the Company's description of the alleged Cause, unless [Mr. Gould] shall, during such 30-day period, remedy the events or circumstances constituting Cause; provided, however, such termination shall take effect immediately upon the giving of written notice of termination for Cause under any of such clauses if the Company shall have determined in good faith that such events or circumstances are not remediable (which determination shall be stated in such notice).

See **Ex. A, § 5(a)(i)**.

25.     Defendant agreed that if Mr. Gould was terminated without Cause, as defined therein, Mr. Gould would be entitled to certain severance benefits, including salary continuation, bonus and incentives, continuation of health insurance and life and long-term care insurance coverages, and vesting of stock options and restricted stocks, during the remainder of the Term as defined therein.  As per its terms, Mr.

Gould was entitled to in excess of ten million dollars ($10,000,000.00) in compensation as of the date of the termination with cause.

26.     The Agreement also provides for attorneys' fees

> [i]n the event Executive incurs legal fees and other expenses in seeking to obtain or to enforce any rights or benefits provided by this Agreement and is successful, in whole or in part, in obtaining or enforcing any such rights or benefits through litigation, settlement, arbitration, mediation or otherwise, the Company shall pay or reimburse Executive's reasonable legal fees and expenses incurred in enforcing this Agreement.

> *See* **Ex. A, § 11**.

27.     The Defendant breached the agreement by not complying with its terms and relying upon a sham investigation as a pretext for termination with cause.

## III.     DEFENDANT'S EXPONENTIAL GROWTH UNDER MR. GOULD'S LEADERSHIP

28.     Under Mr. Gould's leadership, Defendant achieved strong performance in 2018 and as reported in the Company's Schedule 14A Proxy Statement.  A true and correct copy of Defendant's Schedule 14A Proxy Statement is publicly available through the Securities and Exchange Commission and is attached hereto as **Exhibit C.**

29.     Specifically, the Company reported net sales in fiscal year 2018 increased eighteen percent (18%) over fiscal year 2017, resulting in net sales of $1.1

billion.  *See* **Ex. C**.

30.     Further, the Company reported an increase to adjusted operating income by thirteen percent (13%) to $134 million in fiscal year 2018.  *See* **Ex. C**.

31.     Additionally, adjusted earnings per share increased twenty-six percent (26%) to a record $1.49 per share in fiscal year 2018. *See* **Ex. C**.

32.     In addition to these financial successes, Mr. Gould also spearheaded the Defendant's sustainability mission, "Climate Take Back", challenging all industries to operate profitably with carbon negative business models by viewing and using carbon as a resource.  As a result of Mr. Gould's campaign, Defendant became the first in its industry to produce all products as carbon neutral.

33.     Based on Mr. Gould's efforts leading Defendant through such a successful period, Mr. Gould's total compensation for fiscal year 2018 totaled more than $5.1 million.

34.     Mr. Gould also received a three percent (3%) merit increase to his base salary in fiscal year 2018. *See* **Ex. C**.

**IV.   DEFENDANT UNLAWFULLY TERMINATES MR. GOULD'S EMPLOYMENT WITH CAUSE AND REFUSES TO PAY MR. GOULD SEVERANCE IN VIOLATION OF THE EXPLICIT TERMS OF THE AGREEMENT AND SUBSEQUENTLY DEFAMES AND DISPARAGES MR. GOULD**

35.     In October 2019, Director Kennedy, threatened to fire Mr. Gould unless

Mr. Gould adhered to his outlandish demands including terminating a Human Resources executive that Director Kennedy did not personally like and using Director Kennedy's self-selected recruiting firm to find her replacement.

36.    On November 5, 2019, Director Kennedy requested that Mr. Gould attend a meeting at Director Kennedy's office in Chicago. At this meeting, Director Kennedy presented Mr. Gould with a list of other operational changes that Director Kennedy demanded occur before the next Board meeting or Mr. Gould would be fired. Director Kennedy further threatened that if Gould did not follow this outlandish directive, Mr. Gould would be fired, Director Kennedy would destroy Mr. Gould's name, and Director Kennedy would make sure Mr. Gould would never work for another public company.

37.    Immediately, Mr. Gould reported the conversation to Board Chair Hendrix, highlighting the inappropriateness of Director Kennedy's comments and the impossibility of achieving Director Kennedy's demands in the suggested time frame. Mr. Gould told Board Chair Hendrix that he was committed to Interface, but could not be treated in this manner.

38.    In a December 2019 note to Mr. Gould, Board Chair Hendrix acknowledged that Mr. Gould "accomplished some great things at Interface, such as the gross margin expansion, LVT introduction, nora acquisition, Troup County

Optimization, the new CRM and selling system transformation, increased profitability, and [Mr. Gould has] created a sense of urgency."

39.    At the December 2019 Interface Board meeting, another director told Director Kennedy that if he had treated her as he had treated Mr. Gould, then she would have told him "to go f himself." During this meeting, several other Board members suggested that Director Kennedy allow Mr. Gould to run the company.

40.    Interface held its 2020 America's Sales Meeting ("Sales Meeting") in Los Angeles, California. The Sales Meeting took place from 4 p.m. Saturday, January 11, 2020 through approximately 10 p.m. Tuesday, January 14, 2020.

41.    Part of the purpose of the Sales Meeting was to celebrate Interface's success in 2019; in fact, Interface had had three consecutive record years.

42.    Most members of Interface's Global Leadership Team attended the Sales Meeting, including Board Chair Hendrix, Bruce Hausmann, David Foshee, Greg Minano, Natalie Poteran, and Pieter van de Torn.

43.    All members of the leadership team were consuming alcohol at the weekend's events.

44.    In fact, Board Chair Hendrix was seen consuming a "significant amount of wine" and several bourbons at the Sales Meeting events on Sunday and Tuesday.

45.    Interface's General Counsel, David Foshee, was seen having several

drinks with the leadership team on Sunday night and was seen later that night to be "highly intoxicated" at the bar while having inappropriate conversations with junior employees.

46.     At some point during the weekend, Board Chair Hendrix requested that Mr. Gould join him for champagne to celebrate the success of the meeting and the development of the culture.

47.     Within an hour or so, Mr. Gould held a meeting with the sales team in which wine and other mixed drinks were served. The team celebrated its great 2019 success. Allegedly during this sales team meeting, Mr. Gould was intoxicated and used the "f word". This was the pretextual reason for Gould's termination, after a flawed investigation by the same counsel the Board employed for an internal investigation relating to an SEC inquiry.

48.     On January 16, 2020, Mr. Gould received a call from Director Kennedy in which Director Kennedy told Mr. Gould that Interface's Board was investigating a complaint from the Sales Meeting.  It is believed that Director Kennedy and Board Chair Hendrix orchestrated this complaint.

49.     Within days of the sales meeting, Defendant (and upon information and belief, through Board Chair Hendrix and Director Kennedy) authorized an "internal investigation" into Mr. Gould's "behavior".  This "investigation" was instituted by

Board Chair Hendrix's direction as a ruse to terminate Mr. Gould's employment as CEO.  The investigation was requested with malice and intent to terminate Mr. Gould.  The investigation was conducted by King & Spalding, LLP despite an obvious conflict between its representation of the Board and its investigation of a Board Member. The investigation lacked fundamental fairness and did not address the who, what and where issues normally asked of accused and did not allow the accused to identify witnesses or provide sufficient notice or address the motives of the accusers. Moreover, the investigator did not interview all witnesses at the meeting.

50.   To cover up its inaccurate, pretextual, and flawed investigation, Interface threatened and silenced witnesses in an effort to "circle the wagons" and cover up its flawed investigation and pretextual termination.

51.   As consequence of Board Chair Hendrix's pretextual and negligent investigation, Mr. Gould was informed via email at 9:22 a.m. on Sunday, January 19, 2020 that his employment was terminated effective immediately.

52.   Pursuant to Section 4 of the Agreement, the Term of the Agreement as of January 19, 2020 was for a rolling, two-year period due to expire on January 19, 2022.

53.   Defendant informed Mr. Gould that his termination was with Cause

pursuant to Sections 5(a)(i)(A) and (B) of the Agreement based on Mr. Gould's allegedly "repeated abuse of alcohol at Company sponsored events and willful mistreatment of subordinate employees, both in violation of Interface's established lawful policies." This despite the fact that Board Chair Hendrix and other key executives had imbibed significant alcohol and encouraged a meeting in which alcohol would be served to employees. In fact, alcohol was served at every event during the celebration. Mr. Gould was not intoxicated and did not mistreat subordinated employees as other employees have verified.

54.     The next day, on Monday, January 20, 2020, Defendant publicly issued a press release stating that "Jay Gould…was terminated after an investigation concluded that he engaged in personal behavior that violated Company policy and core values."

55.     Defendant further reported in its publicly filed Form 8-K dated January 21, 2020 that the Board "voted to terminate for cause the employment of Jay D. Gould, President and Chief Executive Officer, effective immediately, for violations of the Company's working environment policies.  Mr. Gould is not entitled to receive any severance payment in connection with his termination."

56.     Defendant publicized its unlawful action and communicated these false statements to its employees, the public, and potential and prospective employers of

Mr. Gould.

## V.   DEFENDANT'S   TERMINATION   WAS   A   PRETEXT   FOR UNLAWFUL RETALIATION

57.   The reasoning underlying Mr. Gould's termination is a pretext and was publicized with malice in order to disparage and injure Mr. Gould's name and reputation.

### A.   The Chair and Others Were Intoxicated at Company Events including the 2019 Sales Meeting

58.   Board Chair Hendrix has a reputation for consuming alcohol at Interface events, including Interface's recent holiday party at Interface's Atlanta Headquarters, where it was noted that he was slurring his speech while participating in gambling games.

59.   Board Chair Hendrix also has a reputation for public intoxication at events with Interface employees. In fact, at a recent event, while inebriated, Board Chair Hendrix asked Mr. Gould's wife if he could hold her and reached out to her in an inappropriately sexual manner. She refused and requested Board Chair Hendrix's son to remove Board Chair Hendrix from the situation. Mr. Gould raised concerns about Board Chair Hendrix's comments during the January 14, 2020 sales meeting including his comments about women.

60.    Board Chair Hendrix has been intoxicated at numerous recent company events such as the 2019 holiday party at Interface headquarters. He frequently invites Interface employees to his home for drinks and often gets intoxicated with them.

61.    During the fall of 2019 at a Florida State football game where an Interface employee was present, Board Chair Hendrix got drunk and fell injuring his face.

62.    Moreover, at a November 2019 Atlanta Falcons game where employees were present, after numerous drinks, Board Chair Hendrix fell down and broke his jaw in three places.

### B.    Comments Made About Women Which Belies the Company's Alleged Reason for Termination

63.    At a lunch meeting, Board Chair Hendrix conveyed to Mr. Gould that the "right way to hire a secretary" is that the individual "must fit between desks no more than 24 inches apart" and "a pencil should stay under her breasts". Mr. Gould replied that is not how he hires.

64.    At a lunch meeting, Board Chair Hendrix also conveyed that he discovered an employee, who was married to another Interface employee, had twice slept with Interface subordinates while married, and that neither Board Chair Hendrix, nor the Company, took any disciplinary action against the employee, who remains active at Interface. Board Chair Hendrix hired the employee and did not

want to take action.

65.     Board Chair Hendrix also conveyed that at a previous sales meeting he had found two Interface employees naked and inebriated in a hot tub, but Board Chair Hendrix took no corrective action.

66.     Board Chair Hendrix frequently used the "f" word and other profanity both at the 2019 retreat and company events. In fact, the "f" word has been used at Board meetings.

67.     Board Chair Hendrix and lead executives have used the "f" word and other profanity at other company events and meetings.

68.     As outlined above, Interface retaliated against Mr. Gould for his opposition to discriminatory hiring practices.

## VI.    DEFENDANT BREACHED ITS AGREEMENT AND DEFAMED MR. GOULD

69.     Defendant has breached its Agreement with Mr. Gould by refusing to deliver the severance benefits to which Mr. Gould is entitled.

70.     Defendant has further engaged in a campaign of defamation, libel and disparagement by publicly communicating the pretextual reasons for Mr. Gould's termination causing irreparable damage to Mr. Gould's name and reputation and damaging future earning opportunities.

71.     On January 21, 2020, Mr. Gould sent Defendant Board Chair Hendrix

a letter demanding that Defendant: (1) immediately cease and desist from engaging in its illegal and unlawful conduct and (2) retract all defamatory and/or libelous statements by 5:00 p.m. ET, January 22, 2020.   As of the date of this filing, Defendant has taken no such action to remove the false, defamatory, and disparaging information it publicized and disseminated about Mr. Gould's termination, leaving Mr. Gould with no choice but to seek legal recourse.

**COUNT I**

**RETALIATION FOR OPPOSING PRACTICES MADE UNLAWFUL BY TITLE VII**

72.    Mr. Gould incorporates Paragraphs 1 through 71 as if fully stated herein.

73.    Mr. Gould engaged in a protected activity when he told Board Chair Hendrix that he would not hire individuals based on the criteria in Board Chair Hendrix's inappropriate and offensive comments about women, specifically that a secretary "must fit between desks no more than 24 inches apart" and that "a pencil should stay under her breasts".

74.    Mr. Gould was wrongfully terminated from Interface.

75.    Interface retaliated against Mr. Gould when Interface, at the behest of Board Chair Hendrix, wrongfully terminated Mr. Gould because Mr. Gould voiced

his disdain and disapproval for Board Chair Hendrix's inappropriate and offensive comments about women.

76.     Defendant's unlawful conduct has caused, and will continue to cause, Mr. Gould damages in an amount to be determined at trial including damages for mental anguish and punitive damages. Wherefore, premises considered Plaintiff hereby demands damages in the amount of one hundred million dollars ($100,000,000.00) and such other relief as determined by a jury of his peers.

## COUNT II

**BREACH OF CONTRACT (AMENDED AND RESTATED EMPLOYMENT AND CHANGE IN CONTROL AGREEMENT)**

77.     Mr. Gould incorporates Paragraphs 1 through 71 as if fully stated herein.

78.     The 2017 Amended and Restated Employment and Change in Control Agreement is a valid and binding contract supported by good and valuable consideration.

79.     Mr. Gould has performed all obligations.

80.     Defendant materially breached its Agreement with Mr. Gould in the manner of its termination and failed to pay him under the terms of his contract.

81.     Defendant's breach was in bad faith, and Defendant has failed to pay despite Mr. Gould's demand.

82.     Wherefore premises considered, Gould demands in excess of ten million dollars ($10,000,0000.00) in damages plus damages for stock options and other terms and benefits of this contractual relationship along with attorneys' fees and expenses as well as damages under O.C.G.A. § 13-6-11 and such other relief as determined by a jury of his own peers. Defendant's breach of the Agreement has caused, and will continue to cause, Mr. Gould damages in an amount to be determined at trial.

## COUNT III

## DEFAMATION *PER SE*

83.     Mr. Gould incorporates Paragraphs 1 through 71 as if fully stated herein.

84.     By publishing false statements regarding Mr. Gould's profession, and his termination for employment, publicly in press releases and disseminating information on the Internet to Defendant's employees, customers, investors, and the public at large, including potential and prospective employers, Defendant has published materially false statements of fact concerning Mr. Gould's profession and trade.

85.     The information published by Defendant is false and the defamatory comments regarding Mr. Gould are actionable comments.

86.     Defendant has published unprivileged, defamatory information on the Internet viewable to at least one third party.

87.     Defendant is at fault for publishing the defamatory information.

88.     The published comments were plainly issued with malice aforethought and calculated to injure Mr. Gould's reputation, and with the requisite intent by Defendant to irreparably harm Mr. Gould's professional and business reputation.

89.     The published comments demonstrate an intent to harm Mr. Gould's professional and business reputation and constitute actual malice.

90.     The defamatory comments defamed Mr. Gould on his face and constitute defamation *per se.*

91.     Defendant's unlawful conduct has caused, and will continue to cause, Mr. Gould damages. Wherefore premises considered, Plaintiff hereby demands damages in excess of one hundred million dollars ($100,000,000.00) and such other relief as determined by a jury of his peers.

**COUNT IV**

**DEFAMATION**

92.     Mr. Gould incorporates Paragraphs 1 through 71 as if fully stated herein.

93.    By publishing false and malicious statements regarding Mr. Gould's profession, and his termination for employment, publicly in press releases and disseminating information on the Internet to Defendant's employees, customers, investors, and the public at large, including potential and prospective employers, Defendant has published factual statements capable of defamatory meaning concerning Mr. Gould's profession, as the statements make direct reference to Mr. Gould's employment and subsequent termination.

94.    The information published by Defendant is false and the defamatory comments regarding Mr. Gould are actionable comments.

95.    Defendant has published unprivileged, defamatory information on the Internet viewable to at least one third party.

96.    Defendant is at fault for publishing the defamatory information and acted with negligence in publishing the information.

97.    Defendant's defamatory statements injured Mr. Gould's professional and business reputation. Mr. Gould has had to resign from a charitable board because of these defamatory statements.

98.    Defendant's unlawful conduct has caused, and will continue to cause, Mr. Gould damages. Wherefore, premises considered Plaintiff hereby demands

damages in the amount of one hundred million dollars ($100,000,000.00) and such other relief as determined by a jury of his peers.

## COUNT V

### NEGLIGENT INVESTIGATION

99.    Mr. Gould incorporates Paragraphs 1 through 71 as if fully stated herein.

100.    Defendant had a duty to act in good faith with respect to its treatment of Mr. Gould including, but not limited to, with respect to its undertaking and subsequent reporting of results of an investigation into Mr. Gould's conduct.

101.    Defendant's investigation was fatally flawed and failed to follow reasonable employment law investigation protocols. After interviewing the accuser's witnesses, Mr. Gould was called in and asked only surface level questions and was never asked to identify witnesses who could counter the accusers' accusations.

102.    Defendant breached its duty to act in good faith to Mr. Gould and as a result wrongfully terminated Mr. Gould without Cause as defined by the Agreement, which Defendant has mischaracterized as a termination with Cause in an effort to cut off Mr. Gould's entitlement to his severance benefits.

103.   Defendant further breached its duty by publicly disseminating false, defamatory and disparaging misinformation related to the circumstances underlying Mr. Gould's termination from employment and entitlement to severance benefits. These public statements have disparaged Mr. Gould, his profession, business, character, and reputation.

104.   As a result of the breach, Mr. Gould has suffered the loss of salary, benefits, and other compensation due to him under the Agreement.

105.   Further and as a result of Defendant's breach, Mr. Gould has been subject to humiliation and embarrassment.

106.   Defendant's unlawful conduct has caused, and will continue to cause, Mr. Gould damages in an amount to be determined at trial. Wherefore, premises considered Plaintiff hereby demands damages in the amount of one hundred million dollars ($100,000,000.00) and such other relief as determined by a jury of his peers.

## COUNT VI

### ATTORNEYS' FEES PURSUANT TO O.C.G.A. § 13-6-11 AND THE AGREEMENT

107.   Mr. Gould hereby repeats and incorporates by reference Paragraphs 1 through 71 above as if fully stated herein.

108.   Defendant has acted in bad faith, has been stubbornly litigious, and has caused Mr. Gould unnecessary trouble and expense.

109.   Mr. Gould is entitled to recover from Defendant its reasonable expenses of litigation, including attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

110.   Mr. Gould is entitled to recover from Defendant its legal fees and expenses of litigation, including attorneys' fees, pursuant to the Agreement.

**WHEREFORE**, Mr. Gould respectfully requests that judgment be made and entered in his favor and against Defendant on all counts, and that the Court grant the following relief:

a.   Enter a verdict and judgment in favor of Mr. Gould on all counts in this Complaint;

b.   Award Mr. Gould actual and compensatory damages in an amount to be determined at trial;

c.   Award Mr. Gould punitive and exemplary damages in an amount to be determined at trial;

d.   Award damages for mental anguish;

e.   Award Mr. Gould all attorneys' fees, expenses and costs incurred in the prosecution of this action pursuant to, among other bases, Section 11 of the Agreement and O.C.G.A. § 13-6-11;

f.   Award Mr. Gould pre- and post- judgment interest as allowed by law; and

g.      Grant such other and further relief as this Court deems just and

proper.

## **DEMAND FOR JURY TRIAL**

Mr. Gould hereby demands a trial by jury on all claims so triable.

Respectfully submitted this 14th day of February, 2020.

/s/David W. Long-Daniels
David W. Long-Daniels
Georgia Bar No. 141916
Long-DanielsD@gtlaw.com
Natasha L. Wilson
Georgia Bar No. 371233
WilsonN@gtlaw.com

**GREENBERG TRAURIG, LLP**
Terminus 200, Suite 2500
3333 Piedmont Road NE
Atlanta, Georgia 30305
Telephone: (678) 553-2100
Facsimile: (678) 553-2212

*Attorneys for Plaintiff Jay D. Gould*

*ADMIN 36431128v3*