**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**JAY D. GOULD,**

**Plaintiff,**

**v.**

**INTERFACE, INC.,**

**Defendant.**

**CIVIL ACTION NO.**
**1:20-CV-695-SDG-CCB**

## FINAL REPORT AND RECOMMENDATION

Plaintiff Jay Gould brings this action against Defendant Interface, Inc., his former employer, asserting claims of retaliation under Title VII and breach of contract. Defendant has filed a motion for summary judgment, (Doc. 134), which Plaintiff opposes, (Doc. 167). Defendant filed a reply in support of its motion, (Doc. 180), and the Court heard oral argument on October 26, 2021, (Doc. 190). For the reasons that follow, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment, (Doc. 134), be **GRANTED**.

# I. FACTS

## A. Standards for Presenting Facts at Summary Judgment

Unless otherwise indicated, the Court draws the following facts from Defendant's Statement of Undisputed Material Facts, (Doc. 134-2); Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, (Doc. 167-6); Plaintiff's Statement of Material Facts that Present a Genuine Issue for Trial, (Doc. 167-1); and Defendant's Response to Plaintiff's Statement of Material Facts that Present a Genuine Issue for Trial, (Doc. 181). Additionally, as indicated and as needed, the Court draws some facts directly from the record. *See* Fed. R. Civ. P. 56(c)(3). ("The court need consider only the cited materials, but it may consider other materials in the record.").

For those facts submitted by Defendant that are supported by citations to record evidence, and that Plaintiff has not specifically disputed and refuted with citations to admissible record evidence showing a genuine dispute of fact, the Court deems those facts admitted, under Local Rule 56.1(B). *See* LR 56.1(B)(2)(a)(2), NDGa. ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the

movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1(B)(1).").

The Court has excluded assertions of fact by either party that are immaterial, presented as arguments or legal conclusions, unsupported by a citation to admissible evidence in the record, or asserted only in the party's brief and not the statement of facts. *See* LR 56.1(B)(1), NDGa. ("The Court will not consider any fact: (a) not supported by a citation to evidence . . . (c) stated as an issue or legal conclusion; or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."). The Court has also viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion for summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993). Plaintiff disputes some of Defendant's proffered facts, but many of those objections are over matters that are not necessarily material to the disposition of this case. Accordingly, the Court will not rule on each objection or dispute presented and will discuss those objections and disputes only when necessary to do so regarding a genuine dispute of a material issue of fact.

## B. Material Facts

### *1. Plaintiff's Employment and Employment Agreement*

Defendant Interface, Inc., is a publicly-traded carpet manufacturer. (Doc. 167-6 at ¶ 1). Plaintiff was hired by Defendant in January of 2015 as Chief Operating Officer, was promoted to President and appointed to the Board of Directors in 2016, and was promoted to Chief Executive Officer in March of 2017. *Id.* at ¶¶ 2–3. As CEO, Plaintiff reported to Defendant's Board of Directors, and he was subject to an Amended and Restated Employment and Change of Control Agreement. *Id.* at ¶¶ 4–5, 8. The employment agreement gave the Board of Directors "sole discretion" to terminate Plaintiff "with or without cause," at any time upon written notice, and it defined "cause." (*Id.* at ¶ 6; Doc. 4-1 at 10). The employment agreement's definition of "cause" includes, among other things, Plaintiff's "gross negligence, or willful misconduct with respect to business affairs of the Company" and his "refusal or repeated failure to follow the established lawful policies of the Company applicable to persons occupying the same or similar positions." (Doc. 167-6 at ¶ 11; Doc. 4-1 at 8). The agreement further provides that the timeline for termination for cause varies depending on whether the company has determined, in good faith, that the events or circumstances surrounding termination are remediable. (Doc. 4-1 at 8). A termination for "cause"

based on the clauses noted above would take effect 30 days after the executive receives written notice of the intent to terminate and the Company's description of the alleged cause, unless the executive remedies the events or circumstances giving rise to the cause during the 30-day period. *Id.* However, the termination "shall take effect immediately upon the giving of written notice of termination for [c]ause . . . if the Company shall have determined in good faith that such events or circumstances are not remediable (which determination shall be stated in such notice)." *Id.*

Section 8 of the employment agreement provides that Plaintiff would receive an incentive bonus and equity awards subject to the terms and conditions of Defendant's executive bonus plan and equity awards plan. (Doc. 167-6 at ¶ 14). The Executive Bonus Plan gives the Compensation Committee of the Board authority, "in its sole discretion" and "subject to the express provisions of the Plan," to administer the plan, including the authority to grant awards, to determine to whom and when awards shall be granted, to determine the terms and conditions relating to any award, to determine the dates of each performance period, "to determine whether, to what extent, and under what circumstances an [a]ward may be settled, canceled, forfeited, or surrendered," and to make "all

other determinations deemed necessary or advisable for the administration of the Plan." (Doc. 134-12 at 3–4).

Plaintiff knew that he was subject to accountability for complying with Defendant's policies, although the parties dispute whether Plaintiff was subject to the local policy manual proffered by Defendant. *Id.* at ¶¶ 16–17.

***2. Plaintiff's 2019 Memorandum***

On February 25, 2019, Plaintiff received a memorandum (it is actually two memos, one to Plaintiff and one to the "File," which Plaintiff acknowledged that he received) notifying him of allegations regarding his conduct at a January 2019 global sales meeting, as well as his conduct at a sales meeting two years earlier. (Doc. 167-6 at ¶ 18; Doc. 134-4). The memorandum states that some employees reported that they observed Plaintiff engage in inappropriate conversation and conduct with female employees during the global sales meeting, though Defendant was unable to find support for such allegations and they were thus deemed unsubstantiated. (Doc. 134-4 at 3). The memorandum also states that it was reported that Plaintiff was overly aggressive when discussing work-related issues with account executives. *Id.* Further, it notes that, during the course of the review, an allegation was raised that Plaintiff had touched the backside of one or two female employees during a sales meeting a few years earlier and that two

female employees corroborated each other regarding this alleged incident. *Id.* The memorandum states that alcohol consumption appeared to play a role in all or most of the events in question. *Id.* It notes that Plaintiff was counseled by the Board that "any incident which involves sexual harassment or bullying is inconsistent with the Company's values and will not be tolerated," and that the Board counseled Plaintiff "against the abuse of alcohol at Company-sponsored events, when conducting Company business, attending Company events or interacting with employees where alcohol is served." *Id.* The memorandum states that any further infractions by Plaintiff would result in discipline "up to and including termination for Cause." *Id.* The memorandum notified Plaintiff that he would not receive his annual merit increase and stated that Plaintiff would be required to attend EEO[1] and no harassment training. *Id.*[2]

---

[1] The parties do not define "EEO."

[2] The parties dispute the nature of some of the events that the memo describes, as well as whether Plaintiff actually engaged in the conduct described in the memo. (Doc. 167-6 at ¶¶ 18–26). The Court simply notes the contents of the memo, without making any determination about whether the alleged events giving rise to the investigation discussed in the memo actually occurred.

### *3. Plaintiff's Interactions with Daniel Hendrix*

On January 14, 2020, during Defendant's 2020 Sales Meeting, Plaintiff had lunch with Daniel Hendrix, the former CEO and current Chairman of the Board of Directors at Interface. (Doc. 181 at ¶ 5). The parties, however, dispute the contents of the conversation that Plaintiff and Mr. Hendrix had during that lunch. *Id.* at ¶¶ 7–12. Plaintiff states that, in response to Plaintiff conveying to Mr. Hendrix that he needed to hire a new secretary, Mr. Hendrix told Plaintiff that "the right way to hire a secretary" is that the woman "must fit between desks no more than 24 inches apart" and "a pencil should stay under her breasts." (Doc. 181 at ¶ 7; Doc. 139-1 at 224–25). Plaintiff testified that he responded to Mr. Hendrix, "that's not how we hire." (Doc. 181 at ¶ 10). Hendrix testified that he never said that was the way to hire a secretary, but that he did recount to Plaintiff a story about how the company's founder had made those comments about the right way to hire a secretary between 30 and 40 years ago—and that it was not the way the company presently hired secretaries. (Doc. 140-1 at 238–240). The conversation took place five days before Plaintiff was terminated. (Doc. 181 at ¶ 20). Plaintiff did not inform Human Resources or anyone else about what Mr. Hendrix allegedly said, nor was he aware of such hiring criteria actually being practiced at Interface. (Doc. 167-6 at ¶ 80; Doc. 139-1 at 225–27). He did not make a complaint about these

alleged hiring criteria to anyone and did not know whether the Board knew about them. (Doc. 181 at ¶ 81; Doc. 139-1 at 227).

The parties also dispute what happened after an Atlanta Falcons game that both Plaintiff and Mr. Hendrix attended. (Doc. 181 at ¶¶ 18–19). Plaintiff states that Mr. Hendrix approached Plaintiff's wife after the game and asked if he could hold her, and that Plaintiff and his wife immediately and directly opposed Mr. Hendrix's behavior. *Id.* Defendant states that Mr. Hendrix never asked if he could hold Plaintiff's wife. (Doc. 181 at ¶¶ 18–19; Doc. 140-1 at 261–62).[3] This game took place less than two months prior to Plaintiff's termination. (Doc. 181 at ¶ 19).

***4. The 2020 Sales Meeting***

Defendant holds a sales meeting each year, which culminates in an awards banquet. (Doc. 167-6 at ¶¶ 27–28). In 2020, the meeting was held from January 11-14, and the awards banquet took place on the evening of January 14. *Id.* at ¶¶ 29–30. John Hendrix, Daniel Hendrix's son, testified that at least two speakers during the meeting used profanity in their speeches, possibly during a "skit or something." (Doc. 171-1 at 170–71). Daniel Hendrix testified that an officer of the

[3] Hendrix testified that he hugged Plaintiff's wife on many occasions but that he could not recall ever asking her if he could "hold" her, stating that "hold" is not a word that he would use in that context. (Doc. 140-1 at 261–62).

company used profanity during her speech at the meeting, and that he believed somebody spoke to her about it. (Doc. 181 at ¶ 27; Doc. 140-1 at 30–32). Also during the 2020 Sales Meeting, the interim Co-President of one of Interface's subsidiaries addressed the entire assembly during a speech in which she opened her blazer and "shook her breasts at the audience." (Doc. 181 at ¶ 31).

After the 2020 Sales Meeting awards banquet, Plaintiff called a meeting with the Regional Sales Directors (RSD) in a hospitality suite to thank the directors for their work in 2019 and to talk about 2020. (Doc. 167-6 at ¶¶ 31–32). Among the twenty-five attendees were Plaintiff's assistant Lauren Jones and then-Vice President of Sales, Rhiannon Adams. *Id.* at ¶ 33. During the annual sales meeting, Plaintiff drank alcohol every evening, and on the evening of January 14, he had consumed champagne, wine, and bourbon by the time of the RSD meeting. (*Id.* at ¶ 34; Doc. 139-1 at 158–59, 160–62, 167). In his deposition, Plaintiff stated that while he didn't feel impaired, the attendees at the meeting might have been of the opinion that he was drunk, and Adams stated in her deposition that Plaintiff was intoxicated. (Doc. 139-1 at 169; Doc. 135-1 at 49). However, Adams also testified that she had never seen any behavior from Plaintiff where he was "out of control" or "inappropriate" when drinking. (Doc. 135-1 at 141). During the RSD meeting, Plaintiff used the word "fuck" five or six times, called Adams a "tough bitch,"

used the phrase "wet dreams," and used the phrase "limp dicks" to describe Interface's competition. (Doc. 167-6 at ¶ 39; Doc. 139-1 at 170–75).[4] Adams testified that Plaintiff's conduct and use of profanity were consistent with Interface's culture and that "a lot of leaders talked like that." (Doc. 135-1 at 170).

After the RSD meeting, Plaintiff walked down to the lobby area with Adams and Jones, carrying a glass of bourbon. (Doc. 167-6 at ¶ 45). Jones stated in her interview with King & Spalding (more on the King & Spalding investigation later) that, although Plaintiff did not appear drunk during the RSD meeting, he was definitely drunk during the subsequent hallway discussion with Alison Millsaps-Morris. (Doc. 181 at ¶ 35; Doc. 134-6 at 3). In the lobby hallway, they encountered Millsaps-Morris and Shelby Eanes, two Interface account executives based in

[4] Plaintiff responds that this fact is disputed, but does not offer evidence that disputes it. (Doc. 167-6 at ¶ 39). Plaintiff states that Adams testified that he did not say anything inappropriate at the meeting, that he did not use other expletives, and that she did not hear him use the phrase "limp dicks." *Id.* However, in looking at the deposition testimony cited, it is clear Adams says she did not hear Plaintiff say anything inappropriate (or which she thought was inappropriate) and that she stated that she did not *recall* other expletives, not that they were not used at all. (Doc. 135-1 at 50–51, 167–68). The fact that Adams did not recall everything Plaintiff said does not dispute that the words were, in fact, said, nor does the fact that she did not find his speech to be inappropriate. And, moreover, Plaintiff testified to using each of the terms recounted above during the meeting. (Doc. 139-1 at 170–75).

Atlanta. (Doc. 167-6 at ¶ 46). The parties dispute the contents of the conversation that ensued. (Doc. 134-2 at ¶ 50; Doc. 167-6 at ¶ 50). Millsaps-Morris stated that, during the encounter, Plaintiff was "very intoxicated" and repeatedly called her a "fucking bitch." (Doc. 167-6 at ¶ 50). Plaintiff, however, testified that he did not call Millsaps-Morris a "fucking bitch." (Doc. 139-1 at 184).

***5. The Complaint and Investigation***

On the morning of January 15, 2020, Millsaps-Morris emailed a complaint to Interface's Human Resources department regarding Plaintiff's behavior during the encounter the prior evening. (Doc. 167-6 at ¶ 49). That same morning, Daniel Hendrix notified Christopher Kennedy, the lead independent director for Interface, of a purported "incident" between Plaintiff and Millsaps-Morris. (Doc. 181 at ¶¶ 47–48). He did so before speaking to Millsaps-Morris, but the parties dispute whether he did so before or after receiving any complaint from Millsaps-Morris. (*See* Doc. 167-1 at ¶ 48 (alleging that Hendrix notified Kennedy of a purported "incident" before receiving any complaint from Millsaps-Morris); Doc. 181 at ¶ 48 (disputing Plaintiff's fact and alleging that the cited testimony only notes that Hendrix notified Kennedy around 10:00 a.m. California time without speaking to Millsaps-Morris, but not whether it was before Millsaps-Morris emailed her formal complaint at 9:16 a.m. California time)).

Defendant's independent directors engaged Zach Fardon, a partner at King & Spalding who conducts internal investigations for companies, along with the law firm itself, to investigate the complaint.[5] (Doc. 167-6 at ¶ 51; *see also* Doc. 137-1 at 75). Fardon was tasked with conducting the "factfinding" investigation, while another King & Spalding partner specializing in employment law, Michael Johnston, was tasked with opining whether, based on the results of the investigation, Plaintiff could be subject to termination. (Doc. 167-6 at ¶ 54; Doc. 137-1 at 112–15). Fardon investigated both the incident involving Millsaps-Morris and the RSD meeting, and between January 15th and 17th, King & Spalding interviewed 12 witnesses (lawyers at the firm would eventually interview 40 people), including Plaintiff. *Id.* at ¶ 55. The remaining interviews took place after King & Spalding made a report to the Board on January 17. (Doc. 137-1 at 120–21). Fardon concluded that the witnesses overwhelmingly corroborated each other.[6] *Id.* at 56.

---

[5] The parties dispute whether it was all of Defendant's independent directors or just Kennedy, the lead independent director, who contacted Fardon. (Doc. 167-6 at ¶ 51). The Court, however, does not find this distinction to be material.

[6] Plaintiff states that this fact is disputed, as it misleads the Court to believe that Fardon interviewed 40 witnesses prior to stating his findings to the Board. (Doc. 167-6 at ¶ 56). The Court understands that Fardon did not interview all 40

In her interview with King & Spalding, Millsaps-Morris stated that, on the evening of the incident, she was with Shelby Eanes in the reception area of the hotel and as Plaintiff approached, it was clear he was "highly intoxicated" and that he was "swaying" and walking with the assistance of Jones and Adams.[7] (Doc. 134-9 at 3). She said they were in a quiet area and that Plaintiff told her that although he struggles with connecting with people, he thought that she was great and that he loved her. *Id.* Millsaps-Morris told him that they were "all good" and that she was not a person who needed a lot of positive affirmation, at which point Plaintiff asked her why she had to be such a "fucking bitch." *Id.* at 3–4. She recounted that Plaintiff called her a "fucking bitch" multiple times, that Adams had them take a picture, and that toward the end of the exchange Robin Effler was approaching. *Id.* at 4. Millsaps-Morris stated that she felt the situation was "out of control" and, after walking away, she started to cry. *Id.*

---

witnesses prior to stating his findings to the Board. (*See* Doc. 137-1 at 120–21).

[7] The statements by Millsaps-Morris and Eanes cited to in this R&R come from a memorandum prepared by King & Spalding after the interviews took place, and Plaintiff avers that this evidence contains "inadmissible hearsay and improper legal conclusions based on hearsay evidence." (Doc. 167-6 at ¶¶ 57, 58). Plaintiff does not identify which statements in particular are objectionable, and the Court considers them not for their truth, but rather to demonstrate why Fardon reached the conclusion he did. Moreover, to the extent they are necessary for the truth, they could be reduced to admissible form by having the declarants testify at trial.

Eanes told Fardon in her interview that, when they ran into Plaintiff, Adams, and Jones, Plaintiff was "clearly drunk," "obnoxious," and "uncomfortably close" to her and Millsaps-Morris. (Doc. 134-10 at 3). She stated that Plaintiff called Millsaps-Morris a "fucking bitch" five times, and he put his arm around Eanes and said that Eanes was a "ray of sunshine" and Millsaps-Morris is a "bitch." *Id.* Eanes stated that after she and Millsaps-Morris walked away, Millsaps-Morris started crying. *Id.*

Adams testified that she did not hear anything, while Jones testified that she heard Plaintiff say "fucking bitch" but did not hear the entire conversation. (Doc. 135-2 at 24; Doc. 141-1 at 117–18). The parties dispute whether Plaintiff did or did not recall the incident at all. (Doc. 167-6 at ¶¶ 48, 63; Doc. 181 at ¶ 44; Doc. 139-1 at 183:5–184:17 (Plaintiff's deposition testimony stating that he did recall encountering Millsaps-Morris and Eanes in the lobby, and stating that he did not call Millsaps-Morris a "fucking bitch"); Doc. 134-7 at 4 (Plaintiff's interview with King & Spalding stating that he did not recall running into anyone between the RSD meeting and returning to his room and that he did not recall any interaction that evening where he called a woman a "fucking bitch")).

After interviewing witnesses and reviewing evidence, Fardon concluded that Millsaps-Morris "was telling the truth." (Doc. 167-6 at ¶ 62; Doc. 137-1 at 27).

On January 17, Fardon gave an initial report to the Board. (Doc. 167-6 at ¶ 64; Doc. 137-1 at 275–76). This report was based on the interviews with witnesses that took place prior to January 17, including those with Millsaps-Morris, Eanes, and Jones who all heard Plaintiff say "bitch" and "fucking bitch" in Millsaps-Morris' presence, and those with other witnesses to whom Millsaps-Morris and Eanes spoke immediately after the incident. (Doc. 167-6 at ¶ 65; Doc. 137-1 at 125–26). With regard to the RSD meeting, Fardon found that the allegations of inappropriate conduct were substantiated based on interviews, which took place prior to January 17, with witnesses who were present at the meeting. (Doc. 167-6 at ¶ 66; Doc. 137-1 at 125). After Fardon gave his report to the Board on the factual findings of the investigation, Johnston gave the Board advice regarding its legal options, including his conclusion that there were sufficient grounds to terminate Plaintiff for cause.[8] *Id.* at ¶ 67.

The parties dispute Hendrix and Kennedy's involvement with the investigation. (Doc. 181 at ¶¶ 50–56). Plaintiff states that they were actively involved in the investigation of the complaint against Plaintiff. *Id.* at ¶ 50.

[8] Plaintiff says that this fact sets forth Defendant's legal conclusion. However, the Court finds that this merely sets forth Johnston's legal conclusion, and that it was up to Defendant to make its own subsequent legal conclusion.

Defendant states that they were actively involved in the "matter" following a question regarding an email notifying the board of the complaint. (Doc. 137-1 at 261:24–262:10). Prior to King & Spalding's investigation into Millsaps-Morris' complaint and the 2020 Sales Meeting, Kennedy informed Fardon of Plaintiff's alleged conduct from the 2019 Global Sales meeting. (Doc. 181 at ¶ 52). Kennedy is the lead independent director and spoke with King & Spalding more frequently than the other directors during the investigation. *Id.* at ¶ 53.

***6. Plaintiff's Termination and EEOC Charge***

Based on King & Spalding's report, the Board voted unanimously on January 19, 2020, to terminate Plaintiff's employment for cause.[9] (Doc. 167-6 at ¶ 68). That same day, Plaintiff was informed of his termination by letter, which stated that he was "terminated for [c]ause based on [his] repeated abuse of alcohol at Company sponsored events and willful mistreatment of subordinate employees, both in violation of [Defendant's] established lawful policies" and that the Board had "determined in good faith that the circumstances giving rise to

[9] Plaintiff disputes that he was terminated for cause, stating that there were insufficient grounds to terminate him for cause. (Doc. 167-6 at ¶ 68). It seems Plaintiff is not disputing that Defendant voted to terminate him for cause. Rather, he is making an argument better suited for his brief—that Defendant improperly categorized Plaintiff's termination as "for cause."

[Plaintiff's] termination for Cause are not remediable." (*Id.* at ¶ 69; Doc. 134-15 at 2).

In February of 2020, after Plaintiff had been terminated, the Compensation Committee of the Board unanimously determined that Plaintiff was not entitled to any severance or compensation other than payments he had not previously received, nor was he entitled to any bonus payment or equity award vesting for the fiscal year 2019. (Doc. 167-6 at ¶ 70; Doc. 134-22 at 2–3). The parties dispute whether the committee had the authority to take these actions. (Doc. 167-6 at ¶ 70 (Defendant's fact states that the committee made this determination in accordance with the powers granted to it by Defendant's Executive Bonus Plan and Omnibus Stock Incentive Plan. Plaintiff disputes that the committee has such authority.)).

In reaching its determination, the committee considered Plaintiff's employment agreement and separately applied the provisions of Defendant's Executive Bonus Plan, Omnibus Stock Incentive Plan, and applicable Performance Share Agreements and Restricted Stock Agreements. (*Id.* at ¶ 71; Doc. 134-22 at 2–3). In its resolution, the committee found that Plaintiff was not entitled to an annual bonus for fiscal year 2019 both because his termination for cause occurred before his eligibility for a bonus had been determined and because the committee exercised its discretion to reduce Plaintiff's bonus to nothing. (Doc. 167-6 at ¶ 72;

Doc. 134-22 at 2–3). Plaintiff does not dispute the fact that the committee made these findings, but states that he disputes the fact that the committee had such authority and notes that his Personnel Action Form states that he was entitled to his 2019 bonus. (Doc. 167-6 at ¶ 72). Defendant's applicable Performance Share Agreements with Plaintiff provided that if "employer terminates Grantee for [c]ause . . . , any Performance shares that are not then vested . . . shall be immediately forfeited." (Doc. 167-6 at ¶ 73). Thus, the committee concluded that all outstanding shares subject to Plaintiff's Performance Share Agreements had been forfeited upon his termination for cause, including those that had not vested because his termination occurred before the committee certified attainment of any relevant performance goals for fiscal year 2019. *Id.* at ¶ 74. Lastly, Defendant's Restricted Stock Agreements with Plaintiff provided that if "employer terminates Grantee for [c]ause . . . , any Restricted Shares that are not then vested . . . shall be immediately forfeited." *Id.* at ¶ 75. The committee therefore concluded that all outstanding, unvested shares subject to Plaintiff's Restricted Stock Agreements had been forfeited upon his termination for cause. *Id.* at ¶ 76.

Plaintiff filed a charge with the EEOC on January 31, 2020, and the EEOC issued a right-to-sue letter on February 13, 2020. (Doc. 181 at ¶ 76; Doc. 4-2 at 2).

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is authorized when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Baas v. Fewless*, 886 F.3d 1088, 1091 (11th Cir. 2018). The movant carries this burden by showing the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *See Crane v. Lifemark Hospitals, Inc.*, 898 F.3d 1130, 1134 (11th Cir. 2018).

Once the moving party has adequately supported its motion, the non-moving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation

marks omitted). Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-moving party's case is insufficient to defeat a motion for summary judgment; rather, there must be evidence on which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The non-moving party cannot defeat summary judgment by relying upon conclusory assertions. *Holifield v. Reno,* 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997). Rather, "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) (*en banc*) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.").

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Anderson,* 477 U.S. at 249-50. A factual dispute is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The non-moving party

"must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id*. at 587 (internal quotation marks omitted). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259 (internal quotation marks omitted).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See id*. at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not preclude the entry of summary judgment. *Id.*

**B. Motion for Summary Judgment**

Three claims remain from Plaintiff's amended complaint: a Title VII retaliation claim, a breach of contract claim, and a claim for attorney's fees pursuant to O.C.G.A. § 13-6-11. (Doc. 4; *see also* Doc. 92 (order adopting the report

and recommendation, (Doc. 83), and dismissing Plaintiff's negligent investigation claim); Doc. 127 (stipulation of dismissal of Plaintiff's defamation claims)). In his Title VII retaliation claim, Plaintiff alleges that he engaged in protected activity when he told Hendrix that he would not hire a woman based on whether she could fit between two desks and whether a pencil would stay under her breasts. (Doc. 4 at ¶¶ 73–77). He alleges that he was retaliated against when Defendant wrongfully terminated him because he voiced disdain and disapproval of Hendrix's comments about women. *Id.* In his breach of contract claim, Plaintiff asserts that Defendant materially breached its agreement with Plaintiff in the manner of its termination, that Defendant failed to pay him under the terms of his contract, and that the breach was in bad faith. *Id.* at ¶¶ 78–83. Finally, Plaintiff asserts that he is entitled to recover attorney's fees from Defendant, pursuant to O.C.G.A. § 13-6-11 and his employment agreement. *Id.* at ¶¶ 108–111.

#### 1. *Defendant's Arguments for Summary Judgment and Plaintiff's Responses*

In its brief, Defendant argues that summary judgment should be granted on Plaintiff's Title VII retaliation claim because Plaintiff cannot establish that he engaged in a statutorily protected activity, nor can he show a causal link between any alleged protected activity and his termination. (Doc. 134-1 at 21–27).

Defendant also argues that summary judgment should be granted as to Plaintiff's breach of contract claim because Plaintiff fails to identify any contractual language breached by Defendant, and the provision authorizing Defendant to terminate Plaintiff's employment in its "sole discretion" provides absolute and unqualified discretion to Defendant as a decisionmaker. *Id.* at 27–32. Defendant argues that Defendant's exercise of its express, contractual right cannot as a matter of law constitute a breach of the implied duty of good faith. *Id.* at 33–34. Further, it maintains that there can be no bad faith because it relied on the results of the King & Spalding investigation. *Id.* at 34–40.

Lastly, Defendant argues that, because Plaintiff's substantive claims fail and because he does not succeed in enforcing any rights under the employment agreement, the Court should also grant summary judgment as to his attorneys' fees claim. *Id.* at 40.

In response, Plaintiff argues that summary judgment should not be granted. (Doc. 167 at 8). As to his Title VII retaliation claim, Plaintiff argues that he has established that he engaged in statutorily protected activity, that he suffered an adverse employment action, and that the decision to terminate him was causally related to the protected activity. *Id.* at 10–28. Plaintiff further argues that he establishes sufficient evidence of pretext, such that summary judgment is

precluded, *id.* at 28–33, and that he has presented a convincing mosaic of circumstantial evidence to raise a genuine issue of material fact as to his retaliation claim, *id.* at 33–35.

As to his breach of contract claim, Plaintiff argues that Defendant did not terminate him for cause under the terms of the employment agreement and that his termination lacks any good faith findings of violations of clauses (A) or (B) of the "Cause" provision. *Id.* at 36–37. Plaintiff argues even if the termination was for cause, the decision to terminate him was made in bad faith. *Id.* at 41. Plaintiff also maintains that even if his termination was for cause, he was not paid all he was due, based upon the personnel action form memorializing his termination. *Id.* at 41–42. Finally, Plaintiff argues that the employment agreement expressly provides for attorneys' fees, and that the Court should therefore deny summary judgment on his claim for attorneys' fees. *Id.*

Defendant filed a reply brief, (Doc. 180), and the matter is now ripe for review.

**2. *Title VII Retaliation Claim***

Defendant moves for summary judgment as to Plaintiff's claim of Title VII retaliation, asserting that Plaintiff cannot establish that he engaged in a protected activity or that there is any causal link between an alleged protected activity and

his termination. (Doc. 134-1 at 21–27). Plaintiff responds that summary judgment should be denied under both the *McDonnell Douglas* and convincing mosaic frameworks for analyzing Title VII retaliation claims. (Doc. 167 at 10–35). Plaintiff contends that he engaged in protected activity during his conversation about hiring with Daniel Hendrix, when he opposed Hendrix's request to "hold" Plaintiff's wife, and when he filed his EEOC complaint and the instant lawsuit. *Id.* at 11–20. He further contends that there is a causal link between his protected activity and his termination, *id.* at 20–28, and that there is sufficient evidence of pretext, *id.* at 28–33.

Title VII acts to shield employees from retaliation for certain protected practices. Specifically, the statute provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). The Court will analyze Plaintiff's Title VII retaliation claim under both the *McDonnell Douglas* and the convincing mosaic frameworks for retaliation.

### *a.* The *McDonnell Douglas* Framework

Retaliation claims based on circumstantial evidence are analyzed under the three-part *McDonnell Douglas* burden-shifting framework. *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020). Under this framework, Plaintiff must first establish a *prima facie* case of retaliation. *Id.* If Plaintiff establishes a *prima facie* case, the burden shifts to Defendant to offer a legitimate, nondiscriminatory reason for its employment decision. *Id.* If Defendant does so, the burden shifts back to Plaintiff to establish that the reason offered by Defendant "'was not the real basis for the decision, but a pretext for discrimination.'" *Id.* (quoting *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 806 (11th Cir. 1995)). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: "(1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relationship between the two events." *Johnson*, 948 F.3d at 1325.

Here, Defendant argues that Plaintiff has not established the first and third elements of the *prima facie* case (statutorily protected activity and a causal relationship), and that his claim of retaliation must, therefore, fail. (Doc. 134-1 at 21). Plaintiff argues that he has established a *prima facie* case and that, even if Defendant articulated some legitimate, non-retaliatory reason for Plaintiff's

termination, Plaintiff has shown sufficient evidence of pretext. (Doc. 167 at 10–33). The Court first looks to whether Plaintiff has established the first and third elements of his *prima facie* case of retaliation, as the second element is not in dispute.

i. Statutorily Protected Conduct

An employee engages in a protected activity under Title VII if he has "(1) opposed an unlawful employment practice, or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII's retaliation provision." *Smith v. City of Fort Pierce*, 565 F. App'x 774, 777 (11th Cir. 2014) (citing 42 U.S.C. § 2000e-3(a)). The Eleventh Circuit has held that a plaintiff claiming to have engaged in protected activity under the opposition prong of the statute must show that he had a "good faith, reasonable belief" that the employer has engaged in an unlawful employment practice. *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999) (citing *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). This standard has both a subjective component—that the belief was in good faith—and an objective component—that the belief was objectively reasonable. *Little*, 103 F.3d at 960.

As noted above, Plaintiff identities in his brief three circumstances where he engaged in statutorily protected conduct—(1) when he opposed Hendrix's hiring

statement regarding secretaries, (2) when he opposed Hendrix's harassment of Plaintiff's wife, and (3) when he participated in protected activity by filing the EEOC complaint and this lawsuit, which he argues led the Compensation Committee to strip him of his bonus and long-term incentives. (Doc. 167 at 11–16). Defendant argues that Plaintiff never alleged the second or third theories—that he opposed Hendrix's harassment of his wife or that he participated in protected activity by filing the EEOC complaint and this lawsuit, which led the Compensation Committee to take its actions—and therefore cannot assert them now. (Doc. 180 at 10–11). The Court agrees.

The Eleventh Circuit has held that, "[a]t the summary judgment stage, the proper procedure for plaintiff to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a) . . . [and that a] plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (also noting that "[l]iberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint"); *see also White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1200 (11th Cir. 2015) (same). Here, the retaliation count in the amended complaint

clearly identifies the "protected activity" Plaintiff relies upon (opposing Hendrix's hiring criteria) and the adverse action he suffered (termination):

> **<u>COUNT I</u>**
>
> **RETALIATION FOR OPPOSING PRACTICES MADE UNLAWFUL BY TITLE VII**
>
> 73. Mr. Gould incorporates Paragraphs 1 through 72 as if fully stated herein.
>
> 74. Mr. Gould engaged in a protected activity when he told Board Chair Hendrix that he would not hire individuals based on the criteria in Board Chair Hendrix's inappropriate and offensive comments about women, specifically that a secretary "must fit between desks no more than 24 inches apart" and that "a pencil should stay under her breasts".
>
> 75. Mr. Gould was wrongfully terminated from Interface.
>
> 76. Interface retaliated against Mr. Gould when Interface, at the behest of Board Chair Hendrix, wrongfully terminated Mr. Gould because Mr. Gould voiced his disdain and disapproval for Board Chair Hendrix's inappropriate and offensive comments about women.
>
> 77. Defendant's unlawful conduct has caused, and will continue to cause, Mr. Gould damages in an amount to be determined at trial including damages for mental anguish and punitive damages. Wherefore, premises considered Plaintiff hereby demands damages in the amount of one hundred million dollars ($100,000,000.00) and such other relief as determined by a jury of his peers.

(Doc. 4 at ¶ 73–77). The retaliation count clearly and succinctly lays out Plaintiff's theory of the claim—he engaged in protected activity when he opposed Hendrix's

hiring criteria, and as a result, Defendant terminated him. The count says nothing about having engaged in protected activity by opposing the "hold her" comment directed at Plaintiff's wife following the football game, nor does it in any way suggest that Defendant retaliated against Plaintiff for filing the EEOC charge and this lawsuit by stripping Plaintiff of his 2019 bonus and long-term incentives.[10] *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (noting that the assertion of an additional, separate statutory basis for entitlement to FMLA leave effected a fundamental change in the nature of the plaintiff's interference claim and declining to allow the plaintiff to raise such a theory at

[10] To be sure, paragraph 59 of the amended complaint at least mentions the "hold her" comment and the Falcons game (while saying nothing whatsoever about the Compensation Committee's actions in February of 2020 regarding the bonus and incentives). (Doc. 4 at ¶ 59). And the retaliation count purports to incorporate paragraph 59, along with each and every one of the other 71 paragraphs that preceded that count. But even if the Court ignored the plain language of the count itself—which identifies the relevant protected activity only as opposing Hendrix's hiring criteria—and found that Plaintiff properly alleged a retaliation claim based on the protected activity of opposing Hendrix's comment about wanting to hold Plaintiff's wife, Plaintiff would still not have a viable claim. Title VII prohibits retaliation for opposing an unlawful *employment* practice, and there are no facts to suggest that Plaintiff's wife was in any way denied any privilege of employment by Defendant. *See Holt v. Lewis*, 955 F. Supp. 1385, 1387–88 (N.D. Ala. 1995) (dismissing a Title VII retaliation claim brought by a professor who was fired and claimed retaliation based on the fact that he complained about gender discrimination directed at a non-employee student of the university because there was nothing to tie the discrimination to an employment practice of the defendant), *aff'd*, 109 F.3d 771 (11th Cir. 1997).

summary judgment). Defendant was entitled to know the basis for Plaintiff's retaliation claim and to rely upon the plain language of the complaint identifying the protected activity and the adverse employment action. Because Plaintiff did not allege retaliation based on the protected activity of opposing the comment made to his non-employee wife or retaliation by the Compensation Committee in February of 2020 when they took action regarding his compensation following Plaintiff's filing of an EEOC charge and this lawsuit, those theories of liability are not properly before the Court and may not be raised in response to Defendant's motion for summary judgment. Which leave the protected activity that actually *is* alleged in the complaint—Plaintiff's opposition of Hendrix's hiring criteria.

And as to the "hiring criteria conversation," Plaintiff argues that he held a good faith subjective belief that discrimination existed, and that his belief was objectively reasonable based on Daniel Hendrix's "open and notorious communication of unlawful hiring practices." (Doc. 167 at 17–20). Defendant contends that Plaintiff cannot identify any instance in which the alleged hiring criteria were used, nor that it was known to be a hiring practice. (Doc. 180 at 7). The Court agrees that Plaintiff has not shown that Defendant currently hires secretaries using the criteria allegedly suggested by Daniel Hendrix—Plaintiff testified that he did not know of any secretary that was ever hired using that

criteria, and he does not know what criteria Hendrix used to hire his assistant. (Doc. 139-1 at 225–26). Hendrix testified that he was repeating something he heard the company's founder say 37 years ago. (Doc. 140-1 at 239). Plaintiff makes much of the fact that Hendrix repeated the story to others, including to Katy Owen, Defendant's human resources officer. (Doc. 167 at 19). But even Owen testified that, although she heard Hendrix tell the story about the comment, it was simply in the context of repeating "folklore" from long ago. (Doc. 174–6 at 211). She said that Hendrix "did not say, I did this. This is how I hire a secretary. Dan did not say that. In the conversation that I am telling you about, it was Dan telling the story about, you know, the day—back in the day in LaGrange, you know, somebody, some person down there this is what they did. . . . It was somebody that had come and gone way before my time." *Id.* at 211–12.

However, in the context of a Title VII retaliation claim, the Court does not construe the objective prong of the "good faith, reasonable belief" standard to mean that Plaintiff must show that Defendant actually hired secretaries using the sexist criteria. Rather, Plaintiff must show that his belief that Defendant used the sexist criteria in its hiring practices was objectively reasonable. *See Little*, 103 F.3d at 960; *see also Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1187 (11th Cir. 2001) (in the context of a claim of retaliation after the plaintiff

complained about alleged sexual harassment, the plaintiff did not have to prove that the employer's conduct legally constituted harassment, only that her "'good faith, reasonable belief' that she was the victim of [sexual harassment] led her to report [the alleged illegal] conduct."). Plaintiff alleges that Daniel Hendrix, the current Chairman of Defendant's Board of Directors, told him that "the right way to hire a secretary" is that the woman "must fit between desks no more than 24 inches apart" and "a pencil should stay under her breasts." (Doc. 181 at ¶ 7; Doc. 139-1 at 224–25). Plaintiff's version of events, if credited by the trier of fact, could support a finding that Plaintiff had an objectively reasonable belief that he was opposing an unlawful hiring practice. *See Little*, 103 F.3d at 960; *see also Lipphardt*, 267 F.3d at 1187.

Defendant alternatively argues that, even if Plaintiff had a good faith, reasonable belief that Daniel Hendrix's comments about sexist hiring criteria constituted Defendant engaging in an unlawful employment practice, Plaintiff did not *oppose* the practice because he never specifically identified it as discriminatory or illegal. (Doc. 134-1 at 23–24). "A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010)

(internal quotation marks omitted). "Thus, although an employee need not use the magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation provisions, her complaint must reasonably convey to the employer an allegation of employment discrimination based upon sex rather than merely a claim related to personal animosity, unfairness, or indecorous treatment generally." *Livingston v. Marion Bank and Trust Co.*, 30 F. Supp. 3d 1285, 1314 (N.D. Ala. 2014) (internal quotation marks, alteration, and citation omitted).

Here, Plaintiff's opposition to Hendrix's comment about hiring a secretary based on whether she could fit between two desks no more than 24-inches apart and whether a pencil would stay under her breasts could not possibly refer to anything other than discrimination based upon sex. By opposing this practice, Plaintiff implicitly (if not explicitly) opposed a hiring practice clearly based on gender. Defendant points to *Birdyshaw v. Dillard's Inc.*, but that case does not suggest a different result. 308 F. App'x 431 (11th Cir. 2009). There, the plaintiff complained about an incident that she had with her supervisor where he screamed at her, called her a liar, told her not to "bullshit" him, and called her a "lying bitch." *Id.* at 433. In her complaint, however, she simply described the harsh treatment, without tying it to any discrimination based on her gender. *Id.* at 437. The Eleventh Circuit held the letter was not protected conduct because it did not allege that the

plaintiff was discriminated against on account of a protected ground. *Id.* Unlike the more general unpleasantries at issue in that case, here the comments that Plaintiff opposed about a woman's ability to fit between two desks and whether a pencil will stay under her breasts are unquestionably gender-based. *Murphy*, which Defendant also cites, is also not to the contrary. There, the Eleventh Circuit held that the plaintiff failed to engage in protected activity because, although the supervisor used terms that were "sex based" (including slut, whore, bitch, hooker, and a remark about a student's bust size), the plaintiff simply complained that that the supervisor used vulgar and inappropriate language, without noting that it was sexually hostile or sexually harassing. 383 F. App'x at 918. Here, in contrast, Plaintiff opposed the comment directly to Hendrix immediately after Hendrix said it, and there is no doubt that the criteria were based on gender. All told, Plaintiff has established that he engaged in statutorily protected activity.

ii. Causation

As to causation, Defendant argues that Plaintiff fails to establish any causal link between the alleged protected activity and Plaintiff's termination because the Board did not know of his alleged opposition and the termination decision was based on the independent investigation by King & Spalding. (Doc. 167 at 25–28).

To establish a causal relationship between a protected activity and an adverse employment action, a Plaintiff need prove only "that the protected activity and the negative employment action are not completely unrelated." *Zarza v. Tallahassee Housing Auth.*, 686 F. App'x 747, 753 (11th Cir. 2017) (quoting *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008) (internal quotation marks omitted); *see also Clover*, 176 F.3d at 1354 (same). "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). However, "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action." *Clover*, 176 F.3d at 1354 (quoting *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (internal quotation marks omitted)). This awareness may be established by circumstantial evidence, *id.*, but "an improper motive of one member [of a board] does not impart discrimination on the entire [b]oard." *Rolle v. Worth Cnty. Sch. Dist.*, 128 F. App'x 731, 733 (11th Cir. 2005) (noting that where the only evidence of motive related to a single board member, as opposed to a majority of the board, the plaintiff could not demonstrate causation for retaliation or pretext for discrimination or retaliation).

Here, although there is no issue of temporal proximity, Plaintiff cannot establish causation because he has not established that the Board was actually aware of his statement to Hendrix opposing the hiring criteria when the Board terminated him, nor has he established that Hendrix's knowledge of the statement or alleged retaliatory motive can be imputed to the Board, as Plaintiff argues in his response. (*See* Doc. 167 at 21–22). As Defendant notes, Plaintiff did not mention his conversation with Daniel Hendrix to anyone else, and has not offered evidence that the Board was aware of the conversation. (Doc. 139-1 at 227). Plaintiff maintains that another Board member, Christopher Kennedy, was familiar with the story Hendrix told about the hiring criteria. (Doc. 167-6 at ¶ 81). But Kennedy did *not* testify that he was aware that Plaintiff allegedly opposed the practice in Plaintiff's conversation with Hendrix—he simply said that he first heard of the story about the alleged criteria during the course of the investigation. (Doc. 142-1 at 249). Further, Plaintiff has not offered evidence to suggest that Hendrix had any retaliatory motive, that Hendrix recommended termination to the Board based on anything other than the King & Spalding investigation, or that the Board made the termination decision based on anything other than the investigation. Simply put, there is no evidence that the Board was in any way aware of the alleged protected

activity when it made the termination decision. Therefore, Plaintiff cannot demonstrate causation.

In light of those facts, there is no need to consider the "cat's paw" theory, which both parties discuss. (Doc. 134-1 at 25; Doc. 167 at 28). Under that theory, a plaintiff can show causation by establishing that the decisionmaker followed a biased recommendation of someone else "without independently investigating the complaint against the employee." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.* Here again, there is nothing to show that Hendrix had any retaliatory animus or that the Board was in any way tainted by such animus. But even if there was, the Board relied on the investigation conducted by King & Spalding, which breaks any possible chain of causation between Hendrix and the Board and renders the cat's paw theory inapplicable.

Plaintiff argues that the King & Spalding investigation was not independent, but rather that it was unduly influenced by Hendrix and Kennedy. He argues that Hendrix notified Kennedy of the incident between Plaintiff and Millsaps-Morris before Hendrix had the chance to speak to Millsaps-Morris, that Kennedy engaged Fardon (who has no employment law experience), that

Kennedy told Fardon about the 2019 incident involving Plaintiff, and that Kennedy urged Fardon to interview Plaintiff quickly. (Doc. 167 at 24–26). Even assuming that all of those facts are true (and Defendant quibbles to some degree with many of them), they do not show that Hendrix or Kennedy influenced the investigation in such a way that it was not "independent." Fardon made clear that his role was to serve as a "fact finder for the independent directors of the board," (Doc. 137-1 at 112), and the fact that Kennedy wanted that to occur expeditiously does not in any way suggest that he wanted it to be anything less than thorough. Indeed, the Court cannot fathom how Kennedy could have been alleged to influence the investigation based on his supposed desire to retaliate against Plaintiff because of Plaintiff's opposition to the hiring criteria, when Plaintiff has failed to show that Kennedy (or anyone else for that matter) was aware that he opposed those criteria in the conversation with Hendrix.

Plaintiff cites to *Teal v. City of Dahlonega*, (*see* Doc. 167 at 23–24), in support of his argument. No. 2:09-CV-187-RWS, 2012 WL 95555 (N.D. Ga. Jan. 12, 2012). That case offers a good example of a non-independent investigation, and highlights the weakness of the facts here. In *Teal*, the supervisor threatened "to have a witness arrested and pull his business license if he refused to provide a statement that targeted [p]laintiff." *Id.* at *3. He also participated in the

investigation into the plaintiff's on-the-job conduct. *Id.* Here, Plaintiff offers no evidence that Hendrix held any animus toward him whatsoever, nor has he offered evidence that Hendrix informed anyone on the Board of his conversation with Plaintiff. The fact that Hendrix and Kennedy played a role in selecting a well-established law firm to conduct an investigation falls far short of showing that they influenced the investigation.

Plaintiff further argues not only that the King & Spalding investigation was not independent, but also that the Board could not have relied on the findings of the investigation, as King & Spalding had not yet completed its investigation or findings at the time Plaintiff was terminated. (Doc. 167 at 23–28). The fact that only 12 of 40 interviews took place prior to the termination decision does not demonstrate that retaliatory animus drove the Board to terminate Plaintiff or that Defendant could not have relied on the findings of those interviews alone. At the end of the day, there is nothing to show that the King & Spalding investigation was anything other than independent. Plaintiff has failed to show causation, and he cannot make out his *prima facie* case.[11]

---

[11] In his response brief, Plaintiff argues that, if the *McDonnell Douglas* analysis continued beyond the *prima facie* stage, he could demonstrate that Defendant's reasons for terminating him are pretextual. (Doc. 167 at 28–33). Defendant does not address pretext in its opening brief, nor does it respond to

### *b. The Convincing Mosaic Framework*

The convincing mosaic framework for analyzing a retaliation claim holds that a plaintiff "will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted).

The Court finds that the evidence presented does not create a convincing mosaic that would allow inference of intentional discrimination by Defendant. Plaintiff first argues that Defendant has systematically treated other employees better who engaged in both similar and more egregious conduct than Plaintiff did. (Doc. 167 at 34). He argues that, in other instances, Defendant has offered employees remedial opportunities, such as education or counseling, or has

---

Plaintiff's arguments about pretext in the reply brief. (Doc. 180). Because Defendant does not appear to seek summary judgment based on the portion of the *McDonnell Douglas* framework that looks to the Defendant's legitimate, non-discriminatory reasons for the action and whether those reasons are pretextual, the Court declines to address it.

decided not to reprimand employees at all. *Id.* He points to other employees who cursed at company events, who drank alcohol in excess at company functions, and to one pair of officials who were found naked in a hot tub. (Doc. 167 at 29–32). He suggests that Adams did not recall Plaintiff using the word "fucking bitch" or "limp dicks," and that Plaintiff himself denied calling Millsaps-Morris a "fucking bitch." *Id.*

The overriding problem with Plaintiff's argument (and really his claim as a whole) is that he fails to present any evidence of *discrimination*. It is not enough to simply show that the decision to fire him was a poor one, or that the company turned a blind eye when others drank and cursed—he has to show that the Board's decision to fire him was infected by discriminatory intent. *See Lewis v. City of Union City*, 934 F.3d 1169, 1187 (11th Cir. 2019) (noting that the convincing mosaic route requires a plaintiff to show circumstantial evidence that would allow a jury to infer "intentional discrimination" (internal quotation marks omitted)). In other words, that the Board's decision to fire him was tainted by a desire to retaliate against him for opposing Hendrix's statement during the lunch meeting. But as set forth above, there is simply no evidence that the Board (as opposed to Hendrix, who was only one member) was even aware of Plaintiff's opposition—let alone that it influenced the decision to terminate him. With that in mind, the Court briefly addresses

Plaintiff's individual bits and pieces of information—none of which could lead to an inference of retaliatory intent—because they suffer from other flaws as well.

Although Plaintiff has offered evidence that other employees used profanities during the 2020 sales meeting or behaved inappropriately, he does not offer evidence that those individuals had engaged in such conduct before,[12] and he fails to acknowledge that he was indeed given a remedial opportunity after receiving the 2019 memorandum. The 2019 memorandum specifically stated that Plaintiff "was counseled by the Board" that certain behavior would not be tolerated and that Plaintiff would be required to attend "EEO and no harassment training." (Doc. 134-4 at 3).

Second, Plaintiff argues that Kennedy, motivated by animus toward Plaintiff, allowed Hendrix to actively engage in the investigation and Plaintiff's termination without regard for the thoroughness of the investigation. (Doc. 167 at 34–35). Plaintiff does not offer evidence to support this argument. He has not

[12] In his response brief, Plaintiff lists a prior occasion on which Natalie Poteran used profanity in a company correspondence and was given the opportunity for remedial education. (Doc 167 at 31–32). However, this was not alleged in either Defendant's statement of material facts or Plaintiff's statement of material facts. Thus, the Court need not consider it. *See* LR 56.1(B)(1), NDGa. ("The Court will not consider any fact: (a) not supported by a citation to evidence . . . (c) stated as an issue or legal conclusion; or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts.").

offered evidence that animus drove Kennedy's actions in the investigation, nor has he offered evidence that Hendrix did more than was reasonable for an individual in his position with regard to the investigation. And although Plaintiff has offered evidence that King & Spalding continued the investigation after his termination, this does not demonstrate that the investigation was improper or not independent.

Third, Plaintiff argues that the timing of events was suspicious, including Hendrix's call to Kennedy and the initiation of the investigation without a firsthand account of the incident or a complaint from Millsaps-Morris, and the alleged rush to terminate Plaintiff without a complete investigation. (Doc. 167 at 35). There is simply no evidence that the timing suggests a retaliatory animus. As Board members, Kennedy and Hendrix had an obligation to get the information to the Board as a whole, which then engaged an outside law firm to investigate.

Lastly, Plaintiff points to the temporal proximity between his protected activity, his termination, and his loss of bonus and long-term incentives, along with "prior unjustified threats of termination of his employment." *Id.* Although the temporal proximity of events here is close, as was the case under the *McDonnell Douglas* analysis, this timing alone is insufficient under a mosaic framework. The "prior unjustified threats of termination" refers to a November 2019 meeting in which, Plaintiff alleges, Kennedy threatened to fire Plaintiff if he did not make

certain operational changes before the next board meeting, including terminating a Human Resources executive. (Doc. 4 at ¶¶ 35–36; Doc. 139-1 at 83; Doc. 140-1 at 102). However, the Court cannot discern any connection between that conversation with Kennedy, Plaintiff's later conversation with Hendrix about secretaries, and his termination after the events of the 2020 sales meeting—and certainly not a connection that suggests that the Board's decision to terminate Plaintiff was infected by a desire to retaliate against him for making an oppositional statement that it was unaware of.

Under both the *McDonnell Douglas* and convincing mosaic frameworks, Plaintiff's claim of retaliation cannot survive summary judgment. Summary judgment should, therefore, be **GRANTED** as to Plaintiff's retaliation claim.

### 3. *Breach of Contract Claim*

Defendant argues that summary judgment should be granted on Plaintiff's breach of contract claim, asserting that under the express language of the employment agreement, Defendant acted within its discretion to terminate Plaintiff, and similarly acted within its discretion to deny certain compensation to Plaintiff. (Doc. 134-1 at 27–40). Plaintiff contends that Defendant did not terminate him for cause, did not act in good faith in terminating him, and wrongfully deprived him of compensation that he was due. (Doc. 167 at 36–42).

Under Georgia law, the construction of a contract is a question of law for the court. O.C.G.A. § 13-2-1. If the language of the contract is ambiguous, Georgia law provides that "[t]he cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction." O.C.G.A. § 13-2-3; *see also San Miguel Produce, Inc. v. L.G. Herndon Jr. Farms, Inc*, 506 F. Supp. 3d 1344, 1362 (S.D. Ga. 2020) (same); *Snipes v. Marcene P. Powell and Assocs., Inc.*, 616 S.E.2d 152, 155 (Ga. Ct. App. 2005) (noting that "[a]mbiguity exists when a contract contains an uncertain meaning, is duplicitous, and indistinct, or when a word or phrase may be fairly understood in more than one way"). The meaning of a contract only becomes a question of fact for the jury if ambiguity remains after the court applies the rules of construction. *Gilreath Family & Cosmetic Dentistry, Inc. v. Cincinnati Ins. Co.*, 522 F. Supp. 3d 1279, 1284 (N.D. Ga. 2021). However, "whenever the language of a contract is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required or even permissible, and the contractual language used by the parties must be afforded its literal meaning." *Caradigm USA LLC v. PruittHealth, Inc.*, 964 F.3d 1259, 1268 (11th Cir. 2020) (quoting *First Data POS, Inc. v. Willis*, 546 S.E.2d 781, 784 (Ga. 2001)) (internal quotation marks omitted).

Thus, the first question the Court must answer here is whether the language of the employment agreement is ambiguous. The agreement states that "the Company may terminate Executive's employment hereunder, in its sole discretion, whether with or without Cause, at any time upon written notice to Executive." (Doc. 4-1 at 10, Employment Agreement Section 5(c)). And the agreement defines "Cause" in these terms:

> "Cause" shall mean, for purposes of this Agreement . . . (A) Executive's fraud, dishonesty, gross negligence, or willful misconduct with respect to business affairs of the Company (including its subsidiaries and affiliated companies), (B) Executive's refusal or repeated failure to follow the established lawful policies of the Company applicable to persons occupying the same or similar positions, (C) Executive's material breach of this Agreement, or (D) Executive's conviction of a felony or other crime involving moral turpitude. A termination of Executive for Cause based on clause (A), (B) or (C) of the preceding sentence shall take effect 30 days after Executive receives from the Company written notice of intent to terminate and the Company's description of the alleged Cause, unless Executive shall, during such 30-day period, remedy the events or circumstances constituting Cause; provided, however, such termination shall take effect immediately upon the giving of written notice of termination for Cause under any such clauses if the Company shall have determined in good faith that such events or circumstances are not remediable (which determination shall be stated in such notice).

(Doc. 4-1 at 8, Employment Agreement Section 5(a)(i)). Plaintiff's termination letter states that Plaintiff was terminated for cause, pursuant to Section 5(a)(i)(A) and (B), for "repeated abuse of alcohol at Company sponsored events and willful

mistreatment of subordinate employees, both in violation of Interface's established lawful policies." (Doc. 134-15 at 2). It states that, given the repeated nature of Plaintiff's misconduct and the "irreparable damage it has caused," Defendant "determined in good faith that the circumstances giving rise to [his] termination for Cause are not remediable" and, therefore, that his employment was terminated immediately. *Id.*

Here, the Court finds that the language in the "Cause" provision of the agreement is clear and unambiguous. The Court first looks to section (A), which defines cause as "fraud, dishonesty, gross negligence, or willful misconduct with respect to business affairs of the Company." (Doc. 4-1 at 8, Employment Agreement Section 5(a)(i)(A)). Plaintiff calls into question whether the termination involved "business affairs," citing to an Interface press release which states that "he engaged in personal behavior that violated Company policy and core values." (Doc. 167 at 38, citing Doc. 140-12). He argues that by characterizing his behavior as "personal," Defendant implied that his behavior was unrelated to "business affairs." (Doc. 167 at 38). However, the overall context in which the events in question took place support Defendant's determination that Plaintiff's behavior was related to business affairs. The events took place at a company sales meeting—a business affair of the company—and involved only company employees.

Plaintiff's speech at the RSD meeting was about company sales and was made to company employees, and the alleged conversation with Millsaps-Morris (a fellow employee) took place at the 2020 Sales Meeting with other employees present. The language of the provision related to "business affairs of the company" is not ambiguous, and Defendant's conduct meets that definition.

Next, the Court looks to section (B), which defines cause as the "Executive's refusal or repeated failure to follow the established lawful policies of the Company applicable to persons occupying the same or similar positions." (Doc. 4-1 at 8, Employment Agreement Section 5(a)(i)(B)). Plaintiff argues that Defendant has not identified any policies applicable to him or which he violated through his actions, and that the record evidence does not contain any such policies. (Doc. 167 at 38). He argues that the local policy manual Defendant cites does not apply to him, that the only document governing the terms and conditions of his employment is the employment agreement, that the merger clause contained therein prevents the February 2019 memorandum from imposing additional terms or conditions on his employment agreement or his employment, and that the 2019 memorandum did not constitute a company policy under section (B). *Id.* at 38–40. Regardless of whether the local policy manual applies to Plaintiff or whether Plaintiff was unaware of any company policies prior to receiving and signing the 2019

memorandum, he was certainly made aware that such policies existed upon receipt of the memorandum and was therefore aware of such policies at the 2020 sales meeting. Indeed, the 2019 notice makes clear that Plaintiff was counseled that any incident involving sexual harassment or bullying, or the abuse of alcohol at a company-sponsored event, would not be tolerated, and that any further infractions would result in discipline, "up to and including termination for Cause." (Doc. 134-4 at 3). Defendant signed the notice, indicating that he acknowledged and received it. And in his deposition, Plaintiff acknowledged that he knew that the company's "policy says that it's a violation to abuse alcohol at a company event." (Doc. 139-1 at 108). The memorandum need not have modified Plaintiff's employment agreement to inform Plaintiff of company policies and the consequences of violating those policies. The 2019 memorandum established that Plaintiff was subject to these policies and that Plaintiff had violated the policies at least once—making the alleged 2020 violation a repeat violation. Section (B) of the cause provision is not ambiguous, and Plaintiff's conduct meets the definition of cause.

Plaintiff also argues that the agreement should be construed against the drafter. (Doc. 167 at 40). However, as the Court finds the language of the employment agreement unambiguous, it need not engage in any such

construction. *Caradigm USA LLC*, 964 F.3d at 1268 (noting that "whenever the language of a contract is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required or even permissible, and the contractual language used by the parties must be afforded its literal meaning") (internal quotation marks omitted).

In addition to arguing that his behavior did not fall within the definition of "cause," Plaintiff argues that Defendant's termination decision was not made in good faith, as it was based on a "sham investigation." (Doc. 167 at 41). Defendant argues that it was not subject to the implied duty of good faith as to its termination decision. (Doc. 134-1 at 33–34). Under Georgia law, "[i]f an agreement by its express terms grants a party absolute or uncontrolled discretion in making a decision, then no duty of good faith is implied as to that decision." *Faith Enters. Group, Inc. v. Avis Budget Group, Inc.*, No. 1:11-CV-3166-TWT, 2012 WL 1409403, at *7 (N.D. Ga. Apr. 20, 2012) (quoting *Hunting Aircraft, Inc. v. Peachtree City Airport Auth.*, 636 S.E.2d 139 (Ga. Ct. App. 2006)); *see also Automatic Sprinkler Corp. of Am. v. Anderson*, 257 S.E.2d 283, 284 (Ga. 1979) (holding that where the express language of a contract provided that the award of certain compensation was "entirely within the discretion of the corporation," there could be no breach of an implied covenant of good faith if the corporation exercised such discretion); *Cf.*

*White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358, 1364–65 (N.D. Ga. July 2, 2008) (distinguishing language stating that Wachovia "may" post transactions in any order from the more absolute language in *Automatic Sprinkler*).

Here, the provision governing termination provided that, subject to the terms of the provision governing termination *without* cause, "the Company may terminate Executive's employment hereunder, in its sole discretion, whether with or without Cause, at any time upon written notice to Executive." (Doc. 4-1 at 10, Employment Agreement, Section 5(c)). Thus, in terminating an employee for cause, Defendant was expressly given sole discretion. Defendant determined that Plaintiff fell under the definition of "for cause" and was expressly given the right, in its sole discretion, to terminate Plaintiff on that ground. The language of this contract is indistinguishable from the "entirely within the discretion of the corporation" language in *Automatic Sprinkler*, and as such there is no implied duty of good faith as to the for-cause termination decision, and any claim of a breach of that implied duty must fail.[13]

---

[13] The Court notes that Section 5(a)(i) of the employment agreement does mention "good faith," but does so only in reference to Defendant's determination of whether the events or circumstances in question were remediable, not to the determination of whether Plaintiff could be terminated for cause generally. (Doc. 4-1 at 9, Employment Agreement Section 5(a)(i)). Neither party raises this as an issue.

Moreover, even if Defendant's authority to terminate Plaintiff was qualified rather than absolute, Defendant argues, Plaintiff still has not successfully pled bad faith. (Doc. 180 at 20). Under Georgia law, a decision is not made in good faith where it is made "for arbitrary or capricious reasons, is based on an improper pecuniary motive, or is predicated on dishonesty or illegality." *Shelnutt v. Mayor*, 776 S.E.2d 650, 657 (Ga. Ct. App. 2015) (internal quotation marks omitted). Further, "a decision can be so grossly erroneous, as where there is a total absence of any factual evidence to support it, that it creates an inference of bad faith and dishonest judgment." *Id.* (internal quotation marks omitted). Plaintiff bases its argument that Defendant's decision was made in bad faith on the King & Spalding investigation. (Doc. 167 at 41). However, there is nothing to suggest that Defendant's decision to rely on the King & Spalding investigation was arbitrary or capricious, that it was based on improper pecuniary motive, that it was predicated on dishonesty or illegality, or that there was a total absence of any factual evidence to support it. Although Plaintiff disputes the fact that the investigation was independent, the Court finds no evidence, as explained above, to create a material issue of fact on that point.

Finally, Defendant argues that Defendant's exercise of its "sole discretion" defeats Plaintiff's claim for additional compensation and severance benefits under

the employment agreement, and provides "separate, independent grounds for [Defendant] to deny him the bonus and stock shares he seeks" under the applicable bonus and stock plans. (Doc. 134-1 at 39). Plaintiff argues that even if his termination was for cause, which he contends it was not, he was still never paid all that he was due. (Doc. 167 at 41–42). Plaintiff bases this argument on the employment agreement, stating that even if he is terminated for cause, he is entitled to all "amounts due." *Id.* Plaintiff points to a "personnel action form" dated January 21, 2020 memorializing his termination that states, "Will receive the 2019 bonus when paid in 2020." (Doc. 140-10). However, the Compensation Committee of the Board of Directors determined, in February of 2020, that "no annual bonus for FY 2019 under the Company's Executive Bonus Plan is properly due or payable to Mr. Gould, as his termination for Cause occurred before the Compensation Committee determined the extent to which the Performance Criteria for FY 2019 had been achieved for that Performance Period and before the Compensation Committee had approved the compensation to be paid to each Participant under the Executive Bonus Plan." (Doc. 134-22 at 2). Additionally, as a separate and independent resolution, the Compensation Committee exercised its discretion to reduce any amount otherwise due or payable for Plaintiff's 2019 bonus to $0 due to Plaintiff's "repeated engagement in inappropriate and willful

misconduct and the irreparable damage caused by such misconduct." *Id.* at 2–3.

The Executive Bonus Plan gives the Compensation Committee absolute authority to make the determination it made in its written consent. Specifically, the Executive Bonus Plan grants the Compensation Committee:

> the authority *in its sole discretion*, subject to the express provisions of the Plan, to administer the Plan and to exercise all the powers and authority either specifically granted to it under the Plan or necessary or advisable in the administration of the Plan, including . . . the authority to grant Awards . . . to determine the terms, conditions, restrictions and performance criteria, including Performance Goals, relating to any Award . . . to determine whether, to what extent, and under what circumstances an Award may be settled, canceled, forfeited, or surrendered . . . and to make all other determinations deemed necessary or advisable for the administration of the Plan.

(Doc. 134-12 at 3–4, Section 3(a) (emphasis added)). The language affording the Compensation Committee "sole discretion" to, among other things, grant and cancel an award is not ambiguous, *see Caradigm USA LLC*, 964 F.3d at 1268, and the Compensation Committee acted within its discretion when it declined to award Plaintiff the 2019 bonus. Moreover, it is clear that Plaintiff's employment agreement was subject to the Executive Bonus Plan. (S*ee* Doc. 4-1 at 18, Employment Agreement, Section 8). The "personnel action" form Plaintiff relies on states only that "Will receive the 2019 bonus when paid in 2020." (Doc. 140-10). Plaintiff does not explain what this form is or how it could override the decision

of the Compensation Committee (which had not even made its decision when the form was created on January 21, 2020), which has the "sole discretion" to grant and cancel and award.[14] There is no material dispute of fact regarding Plaintiff's employment agreement, and summary judgment should be **GRANTED** on Plaintiff's breach of contract claim.[15]

---

[14] Plaintiff notes that the personnel action form indicates that he has 20 unused vacation days. (Doc. 140-10). He mentions this fact in connection with his argument regarding the breach of contract, but does not explain how the fact of unused vacation days amounts to a breach. (Doc. 167 at 42). To the extent that Plaintiff is suggesting that he was entitled to be paid for those unused vacation days, he does not point to any evidence to support that suggestion.

[15] Because I recommend that Defendant is entitled to summary judgment on all of Plaintiff's substantive claims, there would be no basis for awarding attorney's fees, and Defendant is entitled to summary judgment on that claim as well. *See, e.g.*, *Perez v. Am. Pro. Assocs., LLC*, No. 1:19-CV-4890-WMR, 2021 WL 5024385, at *3 (N.D. Ga. July 19, 2021) ("With no other underlying substantive claim remaining, Plaintiffs' claim for attorneys fees must be dismissed.")

## III. CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment, (Doc. 134), be **GRANTED**.

There are no other pretrial matters pending in this case, and the Clerk is **DIRECTED** to terminate the referral to the undersigned.

**IT IS SO RECOMMENDED**, this 9th day of February, 2022.

CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE